CONTINENTAL OIL COMPANY and
Gulf Oil Corporation,
Plaintiffs-Appellants,

v.

AMERICAN QUASAR PETROLEUM
CO. OF NEW MEXICO, INC.,
Defendant-Appellee.

No. 77–2036.

United States Court of Appeals,
Tenth Circuit.

Argued March 15, 1979.

Decided May 15, 1979.

Houston G. Williams, Casper, Wyo. (with Richard L. Williams, Casper, Wyo., on the brief), of Wehrli & Williams, Casper, Wyo. (and with Floyd E. Radloff, Continental Oil Company Counsel, Houston, Tex. and E. S. Hurst, Gulf Oil Corporation Atty., Tulsa, Okl., on the brief), for plaintiffs-appellants.

Glenn Parker of Hirst & Applegate, Cheyenne, Wyo., for defendant-appellee.

Before SETH, Chief Judge, and McKAY and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

This diversity case involves the interpretation of an oil and gas farmout agreement. The matter was decided below on cross-motions for summary judgment. The undisputed facts need only be summarized here.

Under the farmout agreement with Continental Oil Co. and Gulf Oil Corp. (the farmoutors), American Quasar Petroleum Co. (Quasar) was required to drill a test well.[1] Quasar bore sole responsibility for drilling and equipping the well, unless the well produced oil or gas. If the well was completed to production, then "the cost of drilling, testing, completing and equipping"[2] the well was to be recovered by Quasar from the proceeds of the well's production.

Although the farmoutors have formally assigned five different matters as constitut-

---

1. The original farmoutee was Chaparral Resources, Inc., which delivered the farmouts to American Quasar Petroleum Co. in return for cash, royalty overrides and Quasar's agreement to assume the duties under the farmout agreement.

2. Record, supp. vol. 1, at 3.

ing error by the trial court, the essence of the dispute is the proper interpretation of that portion of the farmout agreement defining recoverable "costs." The instant controversy arose because the parties made no express provision for costs resulting from an unforeseen occurrence. The occurrence in question was an explosion and fire that ensued when the drilling reached a depth of nearly 13,000 feet. Quasar had to control the blowout and fire, clean up the site and regain the well's pre-blowout depth. The cost of the extra and duplicative work exceeded two and one-half million dollars. Quasar eventually received slightly more than two million dollars from its claim under an insurance policy it held for this purpose. Quasar claims that all the expenses incurred as a result of the blowout are recoverable from the well's production as a "cost" under the farmout agreement regardless of whether such risks were also covered by insurance. The farmoutors argue that expenses resulting from the blowout were not a "cost" under the relevant provision of the farmout agreement to the extent they were covered by Quasar's insurance policy. They contend that allowing Quasar to recover the expenses both under its insurance contract and pursuant to the farmout agreement provision would constitute a windfall amounting to unjust enrichment.

While the contract does not expressly provide for the resolution of this particular dispute, we believe the agreement is sufficiently clear for a reasonable resolution and that it fully supports the decision of the trial court in favor of appellee Quasar. Certain indications of the parties' intent are clear. First, if the well had been unsuccessful, all costs would have been borne by Quasar and it would have obtained whatever benefit insurance coverage provided. Second, the contract did not require Quasar to carry any insurance coverage against blowouts. Third, had the situation been identical to the present one except that Quasar carried no insurance, the "costs" recoverable from production would have been the same as those urged by Quasar on this appeal. That is, they would have in-

cluded expenses resulting from the blowout. Fourth, had there been no blowout, Quasar could not have recovered its blowout insurance premiums as an item of cost. Fifth, the enormously expensive insurance premiums covered operations in addition to the one involved here and periods of time antedating the drilling of this particular well.

These factors support the trial court's conclusion that the parties' agreement did not contemplate reduction of the "costs" otherwise recoverable from the proceeds of the well's production based on obtaining proceeds from this type of insurance. In addition, we believe that a commonsense approach to the reasonable expectations of the parties would reach the same result. Since this kind of insurance had not been required by the agreement of the parties and the premiums would not have been a "cost" recoverable by Quasar under the agreement, the method of financing blowout problems was a burden Quasar bore exclusively. It follows that Quasar should be entitled to the benefits flowing from its choice of method. Had Quasar determined to deposit the sums it paid as premiums into a bank account labeled "blowout fund" rather than purchasing insurance, no one reasonably would argue that blowout expenses would be unrecoverable from the well's production as a "cost" except to the extent that the expenses exceeded the deposit balance. The fact that Quasar opted to fund its risk by deposits with an insurance carrier rather than a bank ought not to produce a different result.

Finally, we do not agree with the farmoutors that recovery of the blowout expenses from production as a "cost" constitutes a windfall to Quasar to the extent that recovery exceeded the insurance premiums "attributable" to the well. Such a view ignores the underlying economic realities of the situation. Quasar did receive insurance proceeds due to this blowout, but Quasar repeatedly pays premiums for such insurance. It does not recover those premiums as a "cost" from the payout of successful wells drilled without incident. The insurance premiums are not a cost of drilling

any particular well, but are a cost of doing such business generally. Any windfall actually chargeable to Quasar would be the amount by which all its insurance recoveries from blowouts worldwide exceed the cost of all its insurance premiums over time. The record does not reveal the extent of this windfall. Indeed, it may not exist. Since insurors have found it profitable to provide such insurance to Quasar and farmoutees generally, it is obvious, at least at the industry level, that premiums paid exceed insurance recoveries. Even if the insurance recovery at issue here returned to Quasar more than it has so far paid out in premiums, over the long run, the economics may be different. Ultimately, Quasar may receive nothing greater than what it pays for. In any event, when the parties have not agreed otherwise, it is neither unsound nor inequitable to let the benefit of insurance go where the burden of its cost lies—with the farmoutee Quasar.[3]

We conclude that the trial court was correct in holding that Quasar "is entitled to the proceeds of the policy effected by it in its own name to protect its own interests."[4] Record, vol. 1, at 145. We also agree that on the facts of this case the farmoutors show no special equities requiring policy proceeds to be credited against recoverable costs under the agreement.[5]

AFFIRMED.

---

3. The parties are at liberty to bargain for either the benefits or burdens of insurance. In the absence of an indication that they have bargained concerning either, we will not imply a shifting of benefit to a party which has assumed no burden.

4. The trial court relied on the authority of cases involving landlord-tenant and vendor-vendee disputes over insurance proceeds as most nearly analogous to the facts of this case. We believe that line of reasoning is also sound.

5. We see no error in the trial court's construing the farmout agreement and the attached operating agreement together in order properly to determine the intent of the parties. Although the operating agreement was not in effect at the time the blowout occurred, we believe the intent of the parties that the contracts be construed together was manifested by the fact that they were attached together, as well as by the internal references in the farmout agreement to the operating agreement.